**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CRIMINAL CASE NO. 1:11cr10**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | <u>**MEMORANDUM OF**</u> |
| | ) | <u>**DECISION AND ORDER**</u> |
| | ) | |
| **JAMES W. "BILL" BAILEY, JR.,** | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| **PETITIONS OF BRIAN D. GARDZE,** | ) | |
| **CARLTON LEE MATTHEWS,** | ) | |
| **STEPHEN M. TODD, DANIEL F.** | ) | |
| **RUSSIAN, BRUCE H. KEEL, and** | ) | |
| **GREGORY McCARTHY.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Motion by Claimants Brian D.

Gardze, Carlton Lee Matthews, Stephen M. Todd, Daniel F. Russian, Bruce

H. Keel, and Gregory McCarthy ("Petitioners") to clarify the Court's Order of

April 8, 2011 regarding the calculation of their interests in certain certificated

securities in Sage Automotive Interiors, Inc. ("Sage"). [Doc. 226]. The Court

held a hearing on this Motion on December 12, 2011. After careful

consideration of the testimony and exhibits presented at the hearing, the

parties' post-hearing filings[1], and the entire record of this case, the Court hereby enters the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

### A.    Procedural Background

1.    On February 1, 2011, the Defendant was charged in a Bill of Information with filing false tax returns, in violation of 26 U.S.C. § 7206(l), committing mail fraud, in violation of 18 U.S.C. § 1341, and committing securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.  [Doc. 1].

2.    The Bill of Information contained a Notice of Forfeiture, which stated the Government's intent to pursue the forfeiture of the Defendant's interest in various property pursuant to 18 U.S.C. § 982 and 28 U.S.C. § 2461(c), including "[a]ny and all shares or percentile ownership of ... Sage Automotive."  [Doc. 1 at 11].

---

[1]The Court directed counsel for both sides to submit proposed findings of fact and conclusions of law following the December 12, 2011 hearing.  The Court notes that the Government's submission was not particularly helpful in that its proposed findings and conclusions were in narrative form, recounted extraneous detail regarding the witnesses who testified at the hearing, set out what the "evidence suggests," and generally argued the Government's contentions.  As such, the Government's filing was more in the nature of an extension of its brief, rather than proposed findings and conclusions.

3. The Defendant entered a plea of guilty to the Bill of Information on February 16, 2011. [Doc. 15].

4. Following the Defendant's plea of guilty, the Government and the Defendant presented the Court with a proposed Consent Order and Judgment of Forfeiture ("Consent Order"), pursuant to which the Defendant agreed to forfeit, among other things, his interest in 110,000 shares of Sage that were seized during the course of the Government's investigation. [Doc. 16 at 8]. Beyond the Defendant's consent to the proposed forfeiture and his stipulation as set forth in the Plea Agreement that he "has or had a possessory interest or other legal interest in each item or property" identified in the Bill of Information [Doc. 3 at ¶8(b)], the Government presented no evidence supporting the forfeiture of the Sage shares. The Consent Order was entered on February 16, 2011.

5. The Petitioners and others (collectively "the Sage Petitioners") filed their Verified Claims on March 11, 2011, seeking to adjudicate the validity of their interest in the Sage certificated securities ("Sage Certificates" or "Certificates"). [Docs. 23-38].

6.   In late March 2001, Sage entered into an agreement to be acquired by another company.  As part of this acquisition, Sage shareholders were offered the option to purchase stock in the acquiring company using the proceeds of the sale of their Sage stock.  Due to the need to redeem the Certificates in the sale process and to preserve their rights to reinvest with the acquiring company, the Sage Petitioners moved for an expedited hearing on their claims.[2]  [Doc. 48].

7.   The Court granted the Petitioners' motion and held an expedited hearing on April 5, 2011.

8.   The Court issued an Order on April 8, 2011 ("Sage Order"), directing the return of the Certificates to the Sage Petitioners subject to certain requirements.  [Doc. 164].

9.   Particularly, the Court concluded that because the Defendant had obtained money from the Sage Petitioners through fraudulent means, a constructive trust arose in those funds at the time that they were conveyed to the Defendant.  [Id. at 7].  Having determined that the Sage

---

[2]To the extent that the Petitioners have sold their shares pursuant to the Court's prior Orders, any references herein to the "Sage Certificates" shall extend not only to the Certificates themselves, but also to the proceeds of the sale of those Certificates, whether such proceeds are held in escrow or have been reinvested in shares of the acquiring company.

Petitioners had a valid legal interest in the funds under state law and that such interest was superior to any interest the Defendant may have had, the Court then conducted a tracing analysis. Using the bank record summaries that were prepared by the Government and introduced at the hearing without objection by the Sage Petitioners ("the Bank Summaries"), the Court applied the lowest intermediate balance rule (LIBR) to trace the Sage Petitioners' funds and determine the amount of the Certificates' value that should be returned to them. The Court recognized a constructive trust on the entirety of the Certificates issued on behalf of some of the Sage Petitioners. [Id. at 8-9]. With respect to the present Petitioners, for whom Certificates were purchased in whole or in part with commingled funds, the Court awarded only a percentage of the Certificates' value. [Id. at 9-10].

10. Some of those Petitioners who received only a percentage of the Certificates' value filed a Motion to Clarify the Order on June 7, 2011, seeking reconsideration of the Court's Order regarding the calculation of their percentage ownership of the Certificates.[3] With regard to Petitioner Stephen Todd's interest, the Petitioners had also discovered

---

[3]Petitioner Dirk R. Pieper, who was awarded 74.19% of the sale proceeds of his Sage Certificate, does not challenge the Court's prior ruling.

an error in the Bank Summaries that had been prepared by the Government that had an effect on the result.  [Doc. 226].

11.   On November 10, 2011, the Court vacated the Sage Order with respect to Petitioners Gardze, Matthews, Todd, Russian, Keel, and McCarthy and set a hearing for December 12, 2011.  The Court further stated that the filings in the ancillary proceeding had caused it to question the basis for the preliminary order of forfeiture obtained by the Government and therefore, the Government would be required to show the requisite nexus between the property subject to the forfeiture order and the offenses to which the Defendant pled guilty.  [Doc. 306].

12.   The hearing regarding Petitioners' Motion to Clarify was held on December 12, 2011.  During the hearing, the Government presented the testimony of five witnesses and offered into evidence voluminous documents as exhibits.  At the conclusion of the Government's nexus presentation, Petitioners submitted nine exhibits of documents concerning the Petitioners' interests in the Certificates.  [Doc. 318].

**B.    The Defendant's Fraudulent Schemes**

13.    From approximately January 2000 to December 2010, the Defendant

committed a series of acts to defraud his investors.   [Doc. 1 at ¶1].

14.    The Defendant founded and operated Southern Financial Services Inc.,

1031 Exchange Services, LLC, and AVL Properties, LLC (collectively,

"the Companies") in Asheville, North Carolina.  [Id. at ¶2].

15.    Through Southern Financial, the Defendant offered different investment

vehicles to his clients, including: (a) Asset Management Accounts, (b)

Investment Accounts; and (c) Self-Directed IRA Asset Management

Accounts.  When clients forwarded funds to the Defendant to invest, he

would    deposit    the    money    in    Southern    Financial    bank    accounts,

regardless of what type of investment the investor selected.  [Id. at ¶¶4,

5].

16.    While the Government maintains that the Defendant engaged in one

overarching fraudulent scheme, the evidence reveals that the Defendant

engaged in various fraudulent schemes with his investors' funds.[4]  For

---

[4]In his Affidavit, the Defendant maintains that he "treated all incoming investor money the same" and that his "scheme made no distinction between investor money supposedly targeted for Self-Directed IRA Asset Management Accounts and that received for investment purposes other than Self-Directed Accounts." [Affidavit of James W. "Bill" Bailey, Jr. ("Bailey Aff."), Doc. 140 at ¶5].  Contrary to his assertions, however, the Defendant did treat some investors' money differently.  While some clients were provided false accounting statements that list bogus investments, others like the

example, some clients received regular account statements which listed bogus investments and fabricated rates of return. [Transcript of Dec. 12, 2011 Hearing, Doc. 318 at 12-45]. With respect to other clients, the Defendant promised to purchase certain assets with funds transferred from the clients' individual retirement accounts ("IRAs") and to act as a custodian thereof, presumably so as to maintain the tax-sheltered nature of the IRA funds. These clients provided funds to the Defendant with the specific directive to purchase a particular asset, such as real estate, or in the case of the Sage Petitioners, stock certificates. While the Defendant may have made fraudulent statements to obtain some of these funds and may have commingled such funds once obtained, these purchases were in fact completed as directed.

17. When more of his victims began to request withdrawals, the Defendant began a "check-kiting" scheme whereby he would deposit checks in one of his Companies' accounts, then write a check out of that account to an

---

Sage Petitioners actually had assets purchased and held for their benefit. In light of this fact, the Defendant's assertion that he treated all investors equally simply is not credible. The Court further notes that the Defendant's credibility is called into doubt by the fact that the Defendant has entered into a Plea Agreement with the Government and is currently awaiting sentencing. As such, the Defendant has a powerful incentive to agree to forfeit as many assets as he possibly can, regardless of whether he actually has any interest therein, and to provide testimony that is helpful to the Government in these forfeiture proceedings.

account at another bank, utilizing the "float" time between the processing of the checks to make any necessary lulling payments to his "investors." [Transcript of Dec. 12, 2011 Hearing, Doc. 318 at 92-93; Defendant's Aff., Doc. 140].

18. Eventually, the Defendant was unable to circulate the checks quickly enough between the accounts because of an overdraft at one institution. He was thus unable to continue his schemes and his offenses were discovered by his bank, HomeTrust, which also notified the authorities. [Transcript of Dec. 12, 2011 Hearing, Doc. 318 at 50-51].

## C. The Sage Certificates

19. In 2008, the entity that was to become Sage was a division of Milliken Corporation ("Milliken"), a textile and chemical company headquartered in Spartanburg, South Carolina. When Milliken decided to withdraw from the automotive market and close the division, the management team of the division decided to pursue incorporating and operating as an independent entity. Over a very short period of time, the management team attracted significant venture capital and converted the division into a privately-held company, which became Sage. The

managers contributed significant capital from their Milliken retirement accounts and many of the division's employees' retirement accounts.

20. In order to utilize the retirement account funds, it was necessary to transfer the funds from their existing retirement accounts with Milliken to new, self-directed Individual Retirement Accounts ("IRAs"). The Petitioners therefore contacted Southern Financial. The Defendant met with the Petitioners in Greenville, South Carolina, and discussed their need for self-directed IRAs. Specifically, he informed them that he was properly licensed and convinced them that he could set up the appropriate accounts to allow the investment of their Milliken retirement funds in Sage. The Petitioners agreed to have the Defendant set up the appropriate accounts through Southern Financial and executed account agreements with the Defendant.

21. Unbeknownst to the Petitioners, the Defendant was not properly licensed to purchase securities and was in fact engaged in various schemes to defraud his clients.

22. The Defendant persuaded the Petitioners to transfer their funds to Southern Financial by his false representations.

23.     The Petitioners bought their Certificates under the terms of the Sage Automotive Interiors, Inc. Stock Subscription Agreement ("Stock Subscription").  Under those terms, the Petitioners had to certify that they were accredited investors and sign in their individual capacity. [Doc. 27, 28, 30, 34, 35, 36 at Exs. B].

24.     The sale of the Certificates was by a private offering.  The Petitioners were eligible to participate in the sale only because of their employment with Sage.  [Id.].

25.     The Petitioners were required to execute all requisite documents prior to the transfer of any funds for the purchase of the Certificates.  [Id.].

26.     Once the documents had been executed by all Petitioners, in September and October of 2009, they began to transfer the funds from their Milliken Retirement Accounts to the Southern Financial HomeTrust Account ***9469.  (hereinafter "Southern Financial Account").

27.     As set out in further detail below, from October 2009 through February 2010, funds were sent from the Southern Financial Account to the Smith Moore Leatherwood LLP ("Smith Moore") law firm, the closing agent for the Sage/Milliken deal, in Greenville, South Carolina.

28.   Petitioner Stephen M. Todd ("Todd"), owned funds in a Milliken Retirement Account administered by T. Rowe Price Retirement Plan Services ("T. Rowe Price"). [Petitioners' Ex. 1 at 957, 958].

29.   Todd directed T. Rowe Price to wire his available funds to the Southern Financial Account. [Id. at 969].

30.   Prior to the transfer of Todd's Milliken Retirement Account funds into the Southern Financial Account on October 30, 2009, funds for the purchase of the Certificates for Petitioners Gardze, Russian, McCarthy, and Keel were transferred from the Southern Financial Account to the law firm of Smith Moore Leatherwood LLP ("Smith Moore") beginning at 9:53 a.m. and concluding at 10:00 a.m. [Petitioners' Ex. 7 at 5128-5135].

31.   Thereafter, at 1:59 p.m., the Southern Financial Account was credited with $91,707.30 that T. Rowe Price had wired to the Southern Financial Account pursuant to Todd's instructions. [Petitioners' Ex. 1: T. Rowe Price letter dated Feb. 14, 2011]. The wire was completed at 1:59 p.m. [Petitioners' Ex.7 at 5124].

32.   After Todd's deposit, the balance of the Southern Financial Account was $445,741.43. [Id. at 5082].

33.    Just a few days later, on November 4, 2009, $50,000 was wired from the Southern Financial Account to Smith Moore. [Petitioners' Ex. 1 at 947].

34.    The wire transfer form indicated that the funds were intended for the benefit of Tim Batson. [Petitioners' Ex. 8 at 5145-46].

35.    The identification of Tim Batson as the beneficiary of this transfer, however, was the result of an inadvertent error. The funds were actually intended for the benefit of Todd and actually credited to him. [Petitioners' Ex. 1: Affidavit of Frank Williams, email of Monica O'Neill dated Dec. 3, 2009, 1:31 p.m.].

36.    A Certificate was issued to Southern Financial as custodian for the benefit of Todd's IRA, thereby rendering Todd the beneficial owner of the Certificate.[5] [Id. at 950].

37.    Before the wire transfer for Todd's purchase, the balance of the Southern Financial Account was $418,664.98, which was the lowest intermediate balance of the Account between the two transfers. [Doc.

---

[5]All of the Certificates at issue were issued to Southern Financial for the benefit of each Petitioner's Individual Retirement Account (IRA). Because an IRA is not a separate legal entity from its owner, the individual Petitioners are the true beneficial owners of the Certificates.

149 at 2; Petitioners' Ex. 8 at 5139]. Consequently, said balance never fell below the $50,000 that was used to purchase Todd's Certificate.[6]

38.   Petitioner Carlton Lee Matthews ("Matthews") also owned funds in a Milliken Retirement Account administered by T. Rowe Price. [Petitioners' Ex. 2 at 386, 387].

39.   Matthews directed T. Rowe Price to wire his available funds to the Southern Financial Account. [Id. at 396].

40.   On October 22, 2009, T. Rowe Price wired $49,141.46 to the Southern Financial Account for Matthews. [Doc. 149 at 1; Petitioners' Ex. 2 at 372 and Ex. 7 at 5116].

41.   Matthews supplemented this amount with a check for $858.54 on November 9, 2009. [Petitioners' Ex. 2 at 370].

42.   On November 12, 2009, $50,000 was wired from the Southern Financial Account to Smith Moore for the purchase of Matthews's Certificate. [Petitioners' Ex. 2 at 366, 368 and Ex. 8 at 5147].

---

[6]Todd, as well as some of the other Sage Petitioners, transferred more money to the Defendant than was required for the purchase of the Certificates. The Petitioners do not seek to recover the remaining portion of these funds in the present proceedings.

43. A Certificate was issued to Southern Financial as custodian for the benefit of Matthews's IRA, thereby rendering Matthews the beneficial owner of the Certificate. [Petitioners' Ex. 2 at 373].

44. Between the two transfers, the lowest intermediate balance in the Southern Financial Account was $319,932.36. [Doc. 149 at 1-2]. Consequently, said balance never fell below the $50,000 that was used to purchase Matthews's Certificate.

45. Petitioner Bruce H. Keel ("Keel") also owned funds in a Milliken Retirement Account administered by T. Rowe Price. [Petitioners' Ex. 3 at 332, 333].

46. Keel directed T. Rowe Price to wire his available funds to the Southern Financial Account. [Id. at 336].

47. On October 22, 2009, T. Rowe Price wired $119,785.71 to the Southern Financial Account. [Id. at 318 and Ex. 7 at 5080; Doc. 149 at 1].

48. On October 30, 2009, $50,000 was wired from the Southern Financial Account to Smith Moore for the purchase of Keel's Certificate. [Petitioners' Ex. 3 at 316 and Ex. 7 at 5130-31].

49. A Certificate was issued to Southern Financial as custodian for the benefit of Keel's IRA, thereby rendering Keel the beneficial owner of the Certificate. [Petitioners' Ex. 3 at 319].

50. Between the two transfers, the balance of the Southern Financial Account never fell below $119,785.71. [Doc. 149 at 1-2]. Consequently, said balance never fell below the $50,000 that was used to purchase Keel's Certificate.

51. Petitioner Brian D. Gardze ("Gardze") owned funds in a Milliken Retirement Account administered by T. Rowe Price. [Petitioners' Ex. 4 at 219, 220].

52. Gardze directed T. Rowe Price to wire his available funds to the Southern Financial Account. [Id. at 223].

53. On October 22, 2009, T. Rowe Price wired $85,549.53 to the Southern Financial Account for Gardze. [Petitioners' Ex. 7 at 5110-11].

54. On October 30, 2009, $50,000 was wired from the Account to Smith Moore for the purchase of Gardze's Certificate. [Petitioners' Ex. 4 at 200-01 and Ex. 7 at 5134].

55. A Certificate was issued to Southern Financial as custodian for the benefit of Gardze's IRA, thereby rendering Gardze the beneficial owner of the Certificate. [Petitioners' Ex. 4 at 204].

56. Between the two transfers, the balance of the Southern Financial Account never fell below $85,549.53. [Petitioners' Ex. 7 at 5082; Doc. 149 at 2]. Consequently, said balance never fell below the $50,000 that was used to purchase Gardze's Certificate.

57. Petitioner Daniel F. Russian ("Russian") owned funds in a Milliken Retirement Account administered by T. Rowe Price. [Petitioners' Ex. 5 at 910, 911].

58. Russian directed T. Rowe Price to wire his available funds to the Southern Financial Account. [Id. at 914].

59. On October 22, 2009, $112,104.96 was wired to the Southern Financial Account for Russian. [Petitioners Ex. 7 at 5112].

60. On October 30, 2009, $50,000 was transferred to Smith Moore for the purchase of Russian's Certificate. [Petitioners' Ex. 5 at 891-92 and Ex. 7 at 5128-29].

61. A Certificate was issued to Southern Financial as custodian for the benefit of Russian's IRA, thereby rendering Russian the beneficial owner of the Certificate. [Petitioners' Ex. 5 at 895].

62. Between the two transfers, the balance of the Southern Financial Account never fell below $112,104.96. [Doc. 149 at 1-2]. Consequently, said balance never fell below the $50,000 that was used to purchase Russian's Certificate.

63. Petitioner Gregory McCarthy ("McCarthy") owned funds in an Milliken Retirement Account administered by T. Rowe Price. [Petitioners' Ex. 6 at 451, 452].

64. McCarthy directed T. Rowe Price to wire his available funds to the Southern Financial Account. [Id. at 455].

65. On October 22, 2009, $149,495.02 was wired from T. Rowe Price to the Southern Financial Account for McCarthy. [Petitioners' Ex. 7 at 5106].

66. On October 30, 2009, $50,000 was wired from the Southern Financial Account to Smith Moore for the purchase of McCarthy's Certificate. [Petitioners' Ex. 6 at 431 and Ex. 7 at 5132-33].

67.  A Certificate was issued to Southern Financial as custodian for the benefit of McCarthy's IRA, thereby rendering McCarthy the beneficial owner of the Certificate.  [Petitioners' Ex. 6 at 435].

68.  Between the two transfers, the balance of the Southern Financial Account never fell below $149,495.02.  [Doc. 149 at 1-2]. Consequently, said balance never fell below the $50,000 that was used to purchase McCarthy's Certificate.

69.  Although his actions in commingling the Petitioners' IRA funds in the Southern Financial Account may have jeopardized such funds' tax-deferred status, the Defendant otherwise completed the purchase of the Certificates as instructed.

70.  Despite his fraudulent misrepresentations to the Petitioners, the Defendant never acted inconsistently with their express instructions regarding the purchase and retention of the Certificates, but rather acted consistently with and in recognition of the Petitioners' superior interest in the Certificates.

71.  The Sage Certificates were physically held in the offices of Southern Financial by the Defendant.  At the time of purchase, the Certificates

issued for the benefit of the Sage Petitioners had a total face value of $1.2 million.

72.     The purchase of the Sage Certificates were not sham transactions designed to hide any assets of the Defendant. There was no collusion between the parties, and at no time did the Petitioners act as proxies or "straw men" for the Defendant.

## II.     CONCLUSIONS OF LAW

### A.     Criminal Forfeiture Procedure

The Defendant is subject to mandatory forfeiture due to his convictions for securities and mail fraud. The criminal forfeiture statute, 18 U.S.C. § 982(a)(2), requires the forfeiture of "any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of" certain enumerated offenses, including mail fraud affecting a financial institution. Another forfeiture statute, 18 U.S.C. § 981(a)(1)(C), authorizes the civil forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" certain enumerated offenses, such as mail or securities fraud. The provisions of § 981(a)(1)(C) are applicable to this case pursuant to 28 U.S.C. § 2461(c) (allowing criminal forfeiture where civil forfeiture is authorized). These statutory provisions require that the district

court "shall order" forfeiture.  <u>See</u> 18 U.S.C. § 982(a)(2); 28 U.S.C. § 2461(c).

"The mandatory nature of that phrase is clear: when the government has met the requirements for criminal forfeiture, the district court *must* impose criminal forfeiture, subject only to statutory and constitutional limits."  <u>United States v. Newman</u>, 659 F.3d 1235, 1240 (9th Cir. 2011) (emphasis added).

Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853, as incorporated by 18 U.S.C. § 982(b), dictate the procedures applicable to a criminal forfeiture proceeding.   Rule 32.2(b)(1) provides for entry of a preliminary order of forfeiture upon the entry of a guilty verdict or a plea of guilty if the Court determines by a preponderance of the evidence that there is a nexus between the identified property and the offense.  <u>See</u> <u>Libretti v. United States</u>, 516 U.S. 29, 38-40, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995). Following the entry of a preliminary forfeiture order, a third party "asserting a legal interest in property which has been ordered forfeited ... may ... petition the court for a hearing to adjudicate the validity of his alleged interest in the property."   21 U.S.C. § 853(n)(2).   The Court must amend the order of forfeiture if the third party demonstrates by a preponderance of the evidence that:

> (A) the petitioner has a legal right, title, or interest in
> the property, and such right, title, or interest renders

the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or *was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section*; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section . . . .

21 U.S.C. § 853(n)(6) (emphasis added).

The possession of a "legal interest" in the forfeited property is "the touchstone for standing" of a third party to challenge a preliminary order of forfeiture. United States v. Oregon, ___ F.3d ___, No. 10-2154, 2012 WL 507050, at *5 (4th Cir. Feb. 16, 2012). The term 'legal interest in the property' encompasses all legally protected rights, claims, titles, or shares in real or personal property. Thus, a petitioner may succeed in his claim against forfeited property if he can demonstrate that he had such a 'legal interest' in the property at the time it was forfeited and that this interest existed in the property subject to the forfeiture." United States v. Schecter, 251 F.3d 490, 494 (4th Cir. 2001) (internal quotation marks and citations omitted).

Although forfeiture is an issue of federal law, courts generally refer to the law of the state that created the property right to determine what interests,

if any, the claimant has in the forfeited property.  Oregon, 2012 WL 507050, at *5; Schecter, 251 F.3d at 494 (applying Maryland law to determine claimant's interest); United States v. Speed Joyeros, S.A., 410 F.Supp.2d 121, 125 (E.D.N.Y. 2006) (recognizing that courts must look to "the law of the jurisdiction that created the property right" in order to determine what interest the claimant has in the property).  Once the legal interests have been defined under state law, federal law determines whether such interests are sufficient for the claimants to prevail under § 853(n)(6).  Oregon, 2012 WL 507050, at *6; United States v. Buk, 314 F. App'x 565, 568-69 (4th Cir. 2009).

**B.    Nexus**

In entering a preliminary order of forfeiture, the Court must determine whether the "requisite nexus" exists between the property to be seized and offense of conviction. Fed. R. Crim. P. 32.2(b)(1)(A).  As noted previously, the Government bears the burden of proving nexus by a preponderance of the evidence.  United States v. Cherry, 330 F.3d 658, 669-70 (4th Cir. 2003).  "[W]here the government's theory is that the property was used to commit, or to facilitate the commission of, the offense of conviction, the government must establish that there was a substantial connection between the property to be forfeited and the offense."  United States v. Herder, 594 F.3d 352, 364 (4th

Cir.), cert. denied, 130 S.Ct. 3440, 177 L.Ed.2d 346 (2010). Where the Government's theory is that the property constitutes proceeds of the defendant's crimes, several courts, including courts in this Circuit, have applied the "but for" test first articulated by the Seventh Circuit in United States v. Horak, 833 F.2d 1235, 1242-43 (7th Cir. 1987). See United States v. DeFries, 129 F.3d 1293, 1313 (D.C. Cir. 1997); United States v. Nicolo, 597 F.Supp.2d 342, 346 (W.D.N.Y. 2009), aff'd, 421 F. App'x 57 (2d Cir. 2011); United States v. Ivanchukov, 405 F.Supp.2d 708, 712 (E.D. Va. 2005); United States v. Benyo, 384 F.Supp.2d 909, 914 (E.D. Va. 2005); United States v. Farkas, No. 1:10cr200 (LMB), 2011 WL 5101752, at *3 (E.D. Va. Oct. 26, 2011). Applying this test, property is considered proceeds and therefore deemed forfeitable if "a person would not have [the property] but for the criminal offense." Nicolo, 597 F.Supp.2d at 346; Farkas, 2011 WL 5101752, at *3.

The preliminary determination of nexus is made independently of any interests alleged by third parties. United States v. Cox, 575 F.3d 352, 358 (4th Cir. 2009). Any third party interests are instead appropriate for adjudication only in ancillary proceedings pursuant to Federal Rule of Criminal Procedure 32.2(c). Cox, 575 F.3d at 358; Ivanchukov, 405 F.Supp.2d at 713

n.12 (citing Fed. R. Crim. P. 32.2(b)(2) ("Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c).")).

In its prior Order, the Court questioned whether the Government had shown the requisite nexus between the Certificates sought to be forfeited and the offenses of conviction and directed that the Government may put on evidence at the December 12, 2011 hearing to demonstrate nexus.[7] [Doc. 306 at 12]. At the hearing, the Government presented the testimony of some of the individuals who forwarded funds to the Defendant for the purpose of investment and in return received false accounting statements representing that their money had been invested in certain funds and was earning certain rates of return when in fact no such investments had been made. [Transcript of Dec. 12, 2011 Hearing, Doc. 318 at 12-45]. The Government further presented the testimony of an employee of Home Trust Bank and the case agent to establish that the Defendant was engaged in a check kiting scheme using Southern Financial's HomeTrust Bank Account at the time that the Sage Certificates were purchased with funds deposited in the same Account. [Id.

---

[7]Relying upon United States v. McHan, 345 F.3d 262, 270 (4th Cir. 2003) and United States v. Reckmeyer, 836 F.2d 200, 2006) (4th Cir. 1987), the Court also afforded the Petitioners an opportunity to present evidence challenging the validity of the nexus determination at the December 12, 2011 hearing. [See Doc. 306 at 18-19].

at 54-112].  The Government also relied upon the Defendant's Affidavit, which had previously been submitted to the Court, as well as the Petitions of record, as further proof of nexus.  [Id. at 113].  Most of this evidence, however, pertained to investors other than the Petitioners, to assets other than the Sage Certificates, and to transactions that were of an entirely different nature from those at issue herein.  This evidence did little, if anything, to show any specific connection between the Defendant's criminal activity and the Certificates.  To the degree that the Government relies on the Defendant's Affidavit, this is also troubling.  The Defendant, having pled guilty, now has a substantial interest in cooperating with the Government.  His willingness to provide evidence that benefits him while adversely affecting his victims renders his Affidavit to be of questionable probative value.  For these reasons, the Government's evidence of nexus is extremely weak, at best.

The Government relies upon a theory that the Sage Certificates constitute the direct proceeds of the Defendant's fraud.  Critically, however, the Government has failed to demonstrate that the Defendant had any beneficial interest in the Certificates.  The Certificates were held for the benefit of the Petitioners, and there is no suggestion, much less any evidence, that these were sham transactions designed to defeat forfeiture or hide assets for

the Defendant. While the Government may have established that the Petitioners were induced to part with their money as a result of the Defendant's misrepresentations regarding his licensure, the Government has not shown that the Defendant actually obtained or retained any beneficial interest in the funds as a result of such fraudulent conduct. The money he received from the Petitioners was given to him with the explicit instruction to purchase specific assets, i.e., the Sage Certificates. Unlike so many of the Defendant's other clients, who gave the Defendant funds with explicit directives for their investment but whose directives were ignored, the Sage Petitioners ultimately received precisely what they had bargained for. The stock purchase transactions were completed and the Certificates were acquired and held for the benefit of the Petitioners, in accordance with the Petitioners' expectations and instructions. In light of these circumstances, the Government's argument that the stock certificates constitute proceeds of the Defendant's crimes is a weak argument at best.

Ultimately, however, the Court need not make a determination regarding the nexus issue, because even if the Court were to determine the Sage Certificates to be proceeds of the Defendant's crimes, the Court concludes

that the Petitioners have established a legal interest that is superior to any claim the Defendant may have had in the Certificates.

**C.    The Petitioners' Interest in the Sage Certificates**

Once nexus has been determined, and a preliminary order of forfeiture has been entered, the next step in the forfeiture process is the filing of ancillary claims.  Oregon, 2012 WL 507050, at *4.  Any third party claiming a legal interest in the forfeited property may file a petition with the district court contesting the forfeiture.  Id. at *3.  If a claimant lacks the requisite legal interest in the forfeited property, his or her claim is subject to dismissal upon motion of the Government.  Id. at *4.  Here, the Government has never moved to dismiss the Petitioners' claims, apparently conceding that they have standing to challenge the forfeiture order.  Because the Petitioners' standing is not contested, the Court will proceed to the next step of the forfeiture process, which is to "determine[ ] whether the petitioner[s] ha[ve] proven by a preponderance of the evidence that [their] interest[s] [were] either vested or superior to the defendant's interest at the time the acts giving rise to forfeiture occurred."  Id. at *4.

Based on the foregoing findings of fact, the Court concludes that under South Carolina law, the Sage Petitioners, as victims of the Defendant's

criminal acts, have demonstrated that they retained a legal interest in the funds of which they were fraudulently deprived.[8]  [See Doc. 164 at 6].  Under South Carolina law, "[a] constructive trust arises whenever a party has obtained money which does not equitably belong to him and which he cannot in good conscience retain or withhold from another who is beneficially entitled to it as where money has been paid by accident, mistake of fact, or fraud, or has been acquired through a breach of trust or the violation of a fiduciary duty."  SSI Med. Servs., Inc. v. Cox, 301 S.C. 493, 500, 392 S.E.2d 789, 793-94 (1990).    A constructive trust is an equitable remedy used "to vindicate right and justice or frustrate fraud."  Whitmire v. Adams, 273 S.C. 453, 457, 257 S.E.2d 160, 163 (1979).  It "arises entirely by operation of law without reference to any actual or supposed intentions of creating a trust."  SSI Med. Servs., 301 S.C. at 500, 392 S.E.2d at 793.  While fraud is an essential element giving rise to a constructive trust, it need not be actual fraud.  Lollis

---

[8]Applying the general rule that the law of the jurisdiction which created the property determines whether a claimant has an interest in forfeited property, the Court has concluded that the law of South Carolina governs whether the Petitioners have a legal interest in the Certificates at issue.  [Doc. 164 at 6].  In Oregon, the Fourth Circuit recognized that under some circumstances it may be appropriate to depart from the application of state law in making a determination of a claimant's interest where there is evidence that the "defendant has manipulated state law property rights to shield assets from the reach of the forfeiture law."  Oregon, 2012 WL 507050, at *8 n.7.  Because there is no evidence of such manipulation here, the Court will "revert to the norm of reliance on state law" in determining the rights of the Petitioners.  See id.

v. Lollis, 291 S.C. 525, 529, 354 S.E.2d 559, 561 (1987). In order to establish a constructive trust under South Carolina law, the evidence must be clear and convincing. SSI Med. Servs., 301 S.C. at 500, 392 S.E.2d at 794.

In the present case, the Petitioners have established by clear and convincing evidence that they are entitled to the imposition of a constructive trust under South Carolina law. It is undisputed that the Defendant persuaded Petitioners to transfer their funds through Southern Financial by false representations. Under South Carolina law, therefore, a constructive trust arose in those funds at the time that they were conveyed to the Defendant. See id. at 500, 392 S.E.2d at 793-94. Thus, even though the Defendant may have persuaded the Petitioners to transfer some interest in the funds to him by means of a fraud, the Petitioners nonetheless maintained a valid legal interest in these funds pursuant to South Carolina law.[9]

A constructive trust constitutes a superior "legal right, title, or interest" in property under § 853(n)(6)(A) and thus may invalidate a criminal forfeiture

---

[9]Even if the Petitioners had not been induced to transfer their funds to the Defendant by fraud, it appears that they would still have maintained a valid legal interest in the funds under the theory of an implied trust. See Traywick v. Wannamaker, 153 S.Ct. 146, 150 S.E. 655, 662 (1929) (Cothran, J., concurring in result) (noting that an implied trust arises "when no express trust is declared, but such words are used that the court infers or the instruments implies that it was the purpose or intention of the parties to create a trust"). In light of the Court's conclusion that a constructive trust arose in this case, however, the Court need not decide whether the Petitioners are also entitled to recovery under an implied trust theory.

order.  See Buk, 314 F. App'x at 568; see also Shefton, 548 F.3d at 1365.

Property obtained with, or traceable to, trust funds is also subject to the

protection of the trust.  United States v. Schwimmer, 968 F.2d 1570, 1583 (2d

Cir. 1992).  This is because mere commingling of the funds does not defeat

tracing.  See  Connecticut Gen. Life Ins. Co. v. Universal Ins. Co., 838 F.2d

612, 619 (1st Cir. 1988).

In its earlier Sage Order, the Court traced the Petitioners' funds through

the Defendant's Southern Financial Account into the purchase of the Sage

Certificates and used the lowest intermediate balance test to determine what

percentage of funds came from the Petitioners for their purchase.  [Doc 164

at 9-10].  The "lowest intermediate balance" rule "is grounded in the fiction

that, when faced with the need to withdraw funds from a commingled account,

the trustee withdraws non-trust funds first, thus maintaining as much of the

trust's funds as possible."  In re Dameron, 155 F.3d 718, 724 (4th Cir. 1998);

In re Seneca Oil Co., 906 F.2d 1445, 1451 (10th Cir. 1990).  Hence, pursuant

to that rule, if the balance amount on deposit in the commingled fund has at

all times equaled or exceeded the amount of funds held in the constructive

trust, the trust's funds remain intact and will be returned to the beneficiary in

their full amount.  In re Dameron, 155 F.3d at 724.  Funds deposited before

the lowest intermediate balance do not affect the amount of the trust, in that the legal fiction maintains that those "before" funds would be expended prior to the lowest intermediate balance of the funds held in trust being reached. Id. Likewise, funds deposited after the lowest intermediate balance is reached do not affect the amount of the trust in that they may not replenish the funds held in trust. Id.

In the prior Sage Order, the Petitioners received only a partial recovery based on tracing. As a result of the December 12, 2011 hearing, the Court now has been provided with more complete banking records that allow tracing of the full amount claimed by the Petitioners. Based upon the evidence presented by the Petitioners, the Court concludes that the Petitioners have now shown by both a preponderance of the evidence and by clear and convincing evidence that each individual Petitioner's funds in the Southern Financial Account were held subject to a constructive trust. When analyzed individually, as is required by the individual claims, the amount of the funds in each constructive trust never fell below the amount deposited by each of the Petitioners. As such, the Petitioners' funds are traceable from their transfer to the Southern Financial Account to their transfer to Smith Moore for the

purchase of the Certificates.[10]  Once purchased, the Certificates were issued

to Southern Financial as custodian for the benefit of the Petitioners' IRAs,

thereby rendering the Petitioners the beneficial owner of the Certificates.  The

Petitioners therefore became the direct holders of the Certificates under South

Carolina law.  See S.C. Code Ann. § 36-8-301.

In determining the superiority of the Petitioners' interests, the Court is

mindful that such an inquiry "is not a precise one, but instead involves

equitable considerations and is necessarily fact-bound and value laden."

Oregon, 2012 WL 507050, at *7.  On this point, the Court finds the Fourth

Circuit's decision in Oregon to be instructive.  In that case, a preliminary order

of forfeiture was issued authorizing the Government to seize funds that the

defendant, a cigarette manufacturer, had deposited into an escrow account

for the benefit of states in which the defendant sold its products.  Two of these

states petitioned to exclude their sub-accounts from the forfeiture.    In

---

[10]The Government has not presented any argument against such calculation,
preferring to challenge the imposition of the constructive trust instead of providing
alternative calculations.  [Doc. 318 at 138-39].  The Court recognizes that the
Government objects to the use of a constructive trust theory and to the application of
LIBR in any form.  Indeed, the Government's counsel has stated that they have found
no other case applying LIBR to grant a constructive trust where there are multiple trust
beneficiaries asserting interests under Section 853(n). [See Doc. 232 at 9].  The Court,
however, has found no other criminal forfeiture case in which the Government has
sought forfeiture of specific assets titled in the name of persons identified by the
Government as the defendant's *victims*.

evaluating the comparative strengths of the parties' claims of interest in the funds, the Fourth Circuit gave great weight to the fact that the defendant's interest was vested at the time of the acts giving rise to forfeiture, while the claimants' interest, which was subject to a number of unfulfilled contingencies, was not. Id. at *7. The Court noted the fact that the vested nature of the defendant's interest placed the Government "in a strong position" with respect to forfeiture. Id. The Court, however, did not end its inquiry there. Rather, the Court went on to examine the relative equities of the parties, noting that the funds were held in escrow by the defendant for the contingent benefit of the claimants, and that if the claimants had been able to demonstrate that the contingencies were imminent or otherwise likely to be met, this may have tilted the calculus in their favor. Id. Finding that there was no evidence that the claimants were even contemplating actions that would have fulfilled these conditions, however, the Court ultimately concluded that the claimants had failed to carry their burden of proving that their legal interest in the escrow funds was superior to the defendant's. Id. at *8. By contrast, in the present case, the Certificates were issued in the names of the Petitioners. Their rights were fully vested at the time of the acts giving rise to any potential forfeiture thereof. While the Defendant had a possessory interest in the Certificates, all

contingencies had been met to provide the Petitioners with the full equitable and beneficial right to the property interest represented by the Certificates. Thus, applying the reasoning of Oregon, the Petitioners' interest in the Certificates is clearly superior to the Defendant's.

During the April 5, 2011, hearing regarding the Sage Certificates, counsel for the Government stated: "Under federal law, the Relation Back Doctrine would preclude such an interest [a state law property interest] because *the government's interest vests at the moment those funds become criminal proceeds, and takes priority, and precludes them [the Sage Petitioners] from having an interest* in the property once they're proceeds." [Transcript of Apr. 5, 2011 Hearing, Doc. 172 at 24, lines 12-16 (emphasis added)]. Contrary to the Government's argument, however, the relation back doctrine does not extinguish the Petitioners' valid legal interests. Under 21 U.S.C. § 853(c), the Government acquires its interest in the forfeited property at the time of the commission of the criminal act giving rise to forfeiture. "Thus, if a third party's interest in the forfeited property, at the time of the criminal acts, was superior to the criminal defendant's interest, then the interest that the government acquires when it steps into the defendant's shoes is subordinate to that of the third party." United States v. Lavin, 942 F.2d 177,

185 (3d Cir. 1991). Since the Defendant received the funds subject to a constructive trust in favor of the Petitioners, whatever interest the Government obtained pursuant to the relation back doctrine was subordinate to the constructive trust. See Willis Mgmt. (Vermont), Ltd. v. United States, 652 F.3d 236, 245 (2d Cir. 2011) ("if a constructive trust properly should be imposed on particular property that was in the possession of the defendant, it was never truly the defendant's property and is not subject to forfeiture to the United States in the first instance"). Application of the relation back doctrine therefore does not preclude the Petitioners from having a superior legal interest in the Certificates.

Once again, the analytical framework set out by the Fourth Circuit in Oregon supports this conclusion. Even though the Defendant may have had possession of the funds at the time of the acts giving rise to any potential forfeiture thereof, all of the conditions had been fulfilled for the Petitioners to have those funds converted into a property interest in Sage. The only item left to be completed was the Defendant's closing of the transaction (which he subsequently did). As such, the Petitioners' interest in the funds was fully vested and the contingencies that yet needed to be met were imminent and

likely to occur.  The Petitioners' interest in the funds was therefore superior, regardless of the operation of the relation back doctrine.

To construe the relation back doctrine in the manner proposed by the Government would be to ignore completely the purpose of the criminal forfeiture laws.  Section 853 instructs that its provisions must be construed liberally "to effectuate its remedial purposes."  21 U.S.C. § 853(o).  As many courts have recognized, the primary remedial purposes of criminal forfeiture are to punish the defendant and to disgorge him of his ill-gotten gains. Libretti, 516 U.S. at 39, 116 S.Ct. 356 ("Congress conceived of forfeiture as *punishment* for the commission of various [crimes].") (emphasis added); United States v. Martin, 662 F.3d 301, 309 (4th Cir. 2011) ("[T]he substantive purpose of criminal forfeiture is . . . to deprive criminals of the fruits of their illegal acts and deter future crimes."); Newman, 659 F.3d at 1243 (stating that criminal forfeiture is a means of disgorging a criminal defendant of his "ill-gotten gains"); United States v. Venturella, 585 F.3d 1013, 1019 (7th Cir. 2009) ("forfeiture seeks to punish a defendant for his ill-gotten gains by transferring those gains ... to the United States Department of Justice") (citation omitted), cert. denied, 130 S.Ct. 1547, 176 L.Ed.2d 139 (2010); United States v. Hoover-Hankerson, 511 F.3d 164, 171 (D.C. Cir. 2007)

("Forfeiture is a means of forcing a criminal defendant to disgorge ill-gotten profits.").

Unlike a civil forfeiture action, which is an *in rem* proceeding brought against the property sought to be forfeited, criminal forfeiture is an *in personam* proceeding. Cherry, 330 F.3d at 669 n.16. "[C]riminal forfeiture is a sanction against the individual defendant rather than a judgment against the property itself." United States v. McGinty, 610 F.3d 1242, 1246 (10th Cir. 2010); Martin, 662 F.3d at 306 ("Criminal forfeiture is part of a defendant's sentence."). Thus, in a criminal forfeiture proceeding, the Government acquires only "the *defendant's* interest in the property . . . ." United States v. Pease, 331 F.3d 809, 810 (11th Cir. 2003). Because criminal forfeiture follows the defendant as part of his penalty, the Government may seize any of the *defendant's property* that is traceable to the proceeds of criminal conduct. See Hoover-Hankerson, 511 F.3d at 171 & n.4 (D.C. Cir. 2007) ("The theoretical limit of forfeiture is the value of the proceeds the defendant possesses from the illegal activity . . ."; thus, "if a defendant purchased a house with his share of the loot from a bank robbery, the house would be considered proceeds subject to forfeiture"); United States v. Genova, 333 F.3d 750, 761 (7th Cir. 2003) ("A change in form from the proceeds immediately

obtained from crime -- for example, use of criminal lucre to buy a house -- does not prevent forfeiture of the resulting property.").

Even though § 853(c) allows the Government to reach forfeitable assets that were held by third parties at the time of conviction, the relation back provision "was designed to prevent defendants from escaping the impact of forfeiture by transferring assets to third parties." United States v. Reckmeyer, 836 F.2d 200, 203 (4th Cir. 1989); see also United States v. Wilson, 659 F.3d 947, 953 (9th Cir. 2011) ("the Government's interest attaches at the time of the crime, in order to prevent criminals from distributing the proceeds of crime to friends, relatives, and straw persons."). "Congress's primary concern in adopting the relation-back provision was to make it possible for courts to *avoid sham or fraudulent transfers* that were aimed at avoiding the consequences of forfeiture. *Congress did not intend to permit courts to void 'arms'-length' transactions*." Reckmeyer, 836 F.2d at 208 (citations omitted) (emphasis added); United States v. Morgan, 224 F.3d 339, 343 (4th Cir. 2000) (noting Congress's intent that § 853(n)(6) "be construed to deny relief to third parties acting as nominees of the defendant or who knowingly engage in sham or fraudulent transactions"). Thus, while the Government may pursue forfeiture of a third party's assets, such forfeiture is still limited only to property in which

the *defendant* truly retains an interest.  Here, there has been no allegation, much less any evidence, presented to suggest that the purchase of the Certificates for the benefit of the Petitioners was in any way a sham transaction designed to hide the *Defendant's* assets.  These were arms'-length transactions; they were not attempts to assist the Defendant in escaping the impact of forfeiture.  The Court does not construe the relation back provision of § 853 as preventing the Defendant from making a legitimate transfer to his ostensible *victim* in recognition of that victim's continuing (and superior) legal interest in the property.

Divesting the Petitioners of their legitimate rights in the Certificates would fail to serve the remedial purposes of the criminal forfeiture statutes. See Pacheco v. Serendensky, 393 F.3d 348, 355 (2d Cir. 2004) (allowing partial forfeiture of real property and noting "[t]he purposes of the forfeiture penalty are to punish, deter and disempower criminals, aims which are not furthered by taking an innocent owner's share") (citations omitted).  As noted previously, § 853 demands that its provisions be construed liberally "to effectuate its remedial purposes"  -- i.e., to punish the Defendant and to disgorge *him* of his ill-gotten gains.  21 U.S.C. § 853(o).  Where, as here, the statute is sought to be applied in a manner which fails to effectuate these

remedial purposes, the statute must be construed strictly. Such narrow construction does not allow for the dispossession of innocent victims who legitimately and rightly expected to receive such property from the Defendant.

The Government urges the Court to allow the forfeiture of all the property identified in the Consent Order and have the Attorney General address the interests of the Petitioners through the remission process provided in 21 U.S.C. § 853(i). [See, e.g., Doc. 319 at 2]. This argument is without merit for several reasons. First, distribution pursuant to remission is a "non-judicial remedy that is left entirely to the Attorney General's discretion." Willis Mgmt., 652 F.3d at 243; 21 U.S.C. § 853(i). As such, the Court does not have jurisdiction to order the Attorney General to make any such distribution. Furthermore, because of its non-judicial nature, the remission procedure is "not an adequate legal remedy that would deprive a district court of its equitable powers to recognize a constructive trust." Willis Mgmt., 652 F.3d at 244. More importantly, however, before the remission process under section 853(i) can even be implemented, the Court is required to make the legal determination that the property is forfeitable. See id. at 245 ("[I]f the property is not forfeited in the first instance, § 853(i) simply would not apply to the property."); United States v. Lacoff, Nos. 10-2040-cv (L), 10-2485-cv (CON),

2011 WL 3191043, at *3 (2d Cir. Jul. 28, 2011) ("[F]ederal remission procedures do not apply until property interests based on innocent ownership are resolved and forfeiture ordered by a court. Thus, remission procedures cannot resolve the competing claims of innocent ownership here at issue.").

The Government's proposal also raises serious separation of powers concerns. To require the Petitioners to undergo the remission process without first determining the extent of their legal interest in the forfeited property would be an improper delegation of the Court's judicial authority to an executive agency, as well as an improper shirking of the obligation conferred on this Court by Congress to adjudicate issues of ownership in an ancillary proceeding.

Issues of due process are implicated as well. Due process requires that third party claimants are entitled to notice and a hearing when a preliminary order of forfeiture is entered with respect to property in which they claim a cognizable interest. See United States v. McHan, 345 F.3d 262, 270 (4th Cir. 2003). The ancillary forfeiture proceeding is the only opportunity that third parties have to be heard before being deprived of property in which they claim a legitimate interest. Allowing the Government to use the remission process in lieu of adjudicating the third-party petitions filed in this matter on their merits

would therefore deprive the claimants of due process.  While the Court recognizes that the Government pursues a legitimate objective in seeking to provide as much restitution as possible to all of the Defendant's clients who were victimized by his actions, the Court cannot and will not ignore the rights of those who claim a legitimate interest in specific assets subject to seizure pursuant to the Consent Forfeiture Order.

The Government's argument that the Court should order forfeiture of the Certificates so that these assets can be liquidated and distributed equally to all "similarly situated victims" through the remission process also ignores the principal distinction between forfeiture and restitution.  Criminal forfeiture and restitution each serve a different remedial purpose.  The primary objective of criminal forfeiture is to punish the defendant, whereas the purpose of restitution is "to make the victim whole again by restoring to him or her the value of the losses suffered as a result of the defendant's crime."  Newman, 659 F.3d at 1241 (quoting United States v. Hunter, 618 F.3d 1062, 1064 (9th Cir. 2010); see also United States v. Boring, 557 F.3d 707, 714 (6th Cir. 2009) ("Given their distinct nature and goals, restitution is calculated based on the victim's loss, while forfeiture is based on the offender's gain.").  The Court, therefore, cannot order forfeiture merely so that the Attorney General may

create a larger restitution pool for the other victims of the Defendant's crimes. Doing so would not serve the remedial purposes of the criminal forfeiture statutes.[11]

In any event, the present case is not one where imposing a constructive trust would unfairly elevate the Petitioners' claims over those of other "similarly situated victims." See, e.g., United States v. Ramunno, 599 F.3d 1269, 1275 (11th Cir. 2010) (affirming district court's decision not to impose constructive trust). As noted previously, some of the Defendant's clients transferred monies to him for the purpose of investing in various funds and accounts which, it turns out, did not in fact exist. Instead of investing these funds as promised, the Defendant used them for whatever purpose he in his sole discretion deemed appropriate.[12] By contrast, the present Petitioners

---

[11]The Government's reliance on the remission procedure is also extremely short-sighted. If the real property assets identified in the Consent Order were seized and liquidated so that the sale proceeds could be distributed to the Defendant's victims *pro rata*, the Government could not possibly obtain fair market value for such assets, given the present economic climate. Liquidating the interests represented by the Sage Certificates would also prove to be problematic. Assuming that the Certificates were sold and reinvested as shares in the acquiring company, it is unknown what market is available, if any, for the resale of those shares. For these reasons, the Court harbors serious concerns that the present value of the assets identified in the Consent Order would be effectively destroyed if forfeiture were allowed to proceed. Committing economic waste in the name of "fairness" is neither ordained nor permitted by the law.

[12]For example, the Defendant used some clients' funds to make lulling payments to other clients to give the appearance that the funds were properly invested and were generating a return when in fact they were not. These lulling payments induced his clients to provide him with more money to invest, which in turn enabled the Defendant to

transferred funds to the Defendant with a specific directive: to purchase

specific identifiable assets, i.e., the Sage Certificates. While the Government

contends that the Defendant *could have* used such funds for any purpose he

deemed appropriate, the fact remains that the Defendant completed the

transactions; he purchased the Certificates as directed and held them as

custodian for the Petitioners' benefit. As a custodian, the Defendant had no

more than a possessory interest in the Certificates. The Petitioners, by

contrast, became the direct holders of the Certificates under South Carolina

law. Clearly, Petitioners are not similarly situated to the other non-Sage

claimants, and the imposition of a constructive trust is appropriate in this

instance.

    The Court views the Government's position in this matter as entirely

misguided. There is no indication that forfeiting assets from the Defendant's

_____

maintain the viability of his Companies and to perpetuate his fraudulent scheme. This
aspect of the Defendant's fraudulent conduct is a classic Ponzi scheme. "Generically, a
Ponzi scheme is a phony investment plan in which monies paid by later investors are
used to pay artificially high returns to the initial investors, with the goal of attracting more
investors." Alexander v. Compton (In re Bonham), 229 F.3d 750, 759 n.1 (9th Cir.
2000). Under such a scheme, proceeds are funneled "from new investors to previous
investors in the guise of profits from the alleged business venture, thereby cultivating an
illusion that a legitimate profit-making business opportunity exists and inducing further
investment." Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F.2d 589,
590 n.1 (9th Cir. 1991). The Government has presented no evidence that the purchase
of the Certificates on behalf of the Sage Petitioners induced further investment or
otherwise furthered the Defendant's Ponzi scheme.

*victims*, rather than from the Defendant or his proxies, was ever contemplated under § 853. For this reason, as well as all of the reasons cited above, the Court questions whether the Government's action and position with regarding to these Petitioners is not substantially justified, thus potentially entitling the Petitioners to recover their reasonable attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

For the foregoing reasons, the Court concludes that the Petitioners possess superior interests under 21 U.S.C. § 853(n)(6)(A) and are entitled to the full value of the sale of their Certificates.

## IV.    CONCLUSION

Petitioners have shown by a preponderance of evidence that they possessed a superior legal interest in the Certificates at the time of the acts which gave rise to the claim of forfeiture. Having established their right to recovery pursuant to 21 U.S.C. § 853(n)(6)(A), the Petitioners are entitled to the full value of their Certificates.

**IT IS, THEREFORE, ORDERED** that the Petitions of Gardze, Matthews, Todd, Russian, Keel, and McCarthy are **GRANTED**, and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to reflect the superior rights of these Petitioners in the certificated

securities of Sage Automotive Interiors, Inc. that were seized by the Government pursuant to the Consent Order and Judgment of Forfeiture.

**IT IS SO ORDERED**.

Signed: February 22, 2012

Martin Reidinger
United States District Judge